NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-1138

ADOPTION OF OCTAVIA.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

After a trial, a Juvenile Court judge found the mother unfit to parent Octavia and terminated her parental rights to the child.  On appeal, the mother argues that the judge should have excused her from attending the trial in person and instead permitted her to attend by video conferencing, and should not have drawn an adverse inference from the mother's failure to appear and testify.  We affirm.

Background.  In 2021, about one year before Octavia was born, the Department of Children and Families (DCF) became involved with the mother while she was in a hospital giving birth to her older daughter, Astrid.[2]  When the mother tested positive for marijuana and disclosed that she had been living

_____

[1] A pseudonym.

[2] Also a pseudonym.

with a man who was a level 3 sex offender, a report pursuant to G. L. c. 119, § 51A (51A report), was filed alleging neglect of Astrid. After the mother agreed to live in a shelter with twenty-four hour supervision, DCF's case was closed.

In July 2021, several 51A reports were filed and later substantiated as to neglect of Astrid, who was then about one month old. DCF took custody of Astrid. In connection with Astrid's care and protection case, DCF referred the mother to services, including a parent aide, and made recommendations for housing, but the mother failed to follow through on those services. In April 2022, the judge found the mother unfit to care for Astrid and awarded permanent custody of Astrid to DCF.

Meanwhile, the mother had a sexual relationship with a man who she later claimed was Octavia's father.[3] That man was physically and verbally abusive to the mother and forced her against her will into prostitution and cocaine use. The DCF social worker saw information on social media that the mother was pregnant and asked her about it; the mother initially denied it, but two months later admitted that she was pregnant. The mother requested that DCF assign a different social worker because that one made her "uncomfortable" by asking about her

---

[3] That man adamantly denied that he was the father of Octavia. At the seventy-two hour hearing in this case, the judge allowed his motion to strike him as a party.

2

pregnancy, which the mother considered "none of [DCF]'s business."  During her pregnancy with Octavia, the mother was homeless and "couch surfing" at various friends' homes.

In August 2022, the mother was admitted to a hospital for pre-eclampsia; she tested positive for marijuana and was held due to concerns for her mental health.  When Octavia was born later that month, DCF filed a care and protection petition and the judge awarded custody of Octavia to DCF.

Following Octavia's birth, the mother was living in a shelter for exploited women.  By late September 2022, the mother was evicted from the shelter for violating curfew and disappearing for days at a time.  During the pendency of Octavia's care and protection case, the mother lived in at least eighteen different residences and did not follow up with housing referrals that DCF provided.

The mother was diagnosed with depression and began seeing a therapist, but she was not honest with the therapist about issues including her drug use and association with violent people.  The mother limited what information she would allow the therapist to share with DCF.  The mother told the social worker that she had been prescribed an antidepressant by a psychiatrist but would not disclose sufficient details to permit DCF to confirm that information.

On at least one occasion the mother canceled a scheduled visit with Octavia, stating that she did not have money to take the train.  The mother often reported to DCF that she had no money, even on days when she received her government benefit payments; in fact, those benefits were going to a friend who was stealing the money.  The social worker advised the mother to file fraud charges against the friend and obtain a new Social Security card.

In October 2022, the mother told the social worker that she thought adoption was in the best interests of both Astrid and Octavia.  She admitted, "At this point I don't think I'm stabilized . . . .  I can't really do much for them right now."  In November the mother stipulated to termination of her parental rights to Astrid and entered into an open adoption agreement.  At least twice, the mother told the social worker that she also planned to sign an open adoption agreement for Octavia.  Due to the mother's lack of progress toward reunification with Octavia, on November 21, 2022, DCF's goal for Octavia was changed to adoption.  DCF began looking for a family that would adopt both Astrid and Octavia.

On December 29, 2022, a pretrial hearing was held by video conference.  The mother's attorney informed the judge that he

had twice sent the mother e-mails containing the link for the video conference. The mother did not appear.

In January 2023, the social worker reminded the mother that a foster care review meeting in Octavia's case was scheduled for January 17. The social worker confirmed repeatedly that the mother had the link to access the video conference of the meeting. The mother did not appear.

The mother told the social worker that she was moving to West Virginia where she could afford to rent a house with her Social Security benefits. When the social worker expressed concerns that the mother would miss visits with Octavia, the mother replied that she would "figure something out." The next day, the mother failed to confirm a visit with Octavia, and so it was canceled. The mother told the social worker, "I'm not planning on coming back up here until I'm sure I'm going to get my kids back," then asked if she could get both children back if she found a house in West Virginia. The social worker reminded the mother that her rights to Astrid had been terminated and that if she moved to West Virginia she would not be able to have in-person visits with Octavia. On January 27, the mother took a bus to West Virginia. Accompanying her on the move was the same friend who had been stealing her government benefits. Throughout the two months before trial, the mother repeatedly

5

told the social worker that she would buy a bus ticket to Massachusetts when she received her benefit payment, and it was the social worker's understanding that the mother had the money to do so.

On February 17, 2023, Octavia was placed in a preadoptive home with her sister Astrid. The judge found that Octavia and Astrid "share a strong sibling bond with a lot of love," and that Octavia is bonded to the preadoptive parents.

On February 21, 2023, the mother moved in limine to be permitted to participate in the trial by video conference. Unsupported by affidavit, that motion asserted that the mother did "not have the financial ability to travel to Massachusetts" for the trial. The judge denied the motion.

On the original trial date, February 27, 2023, the mother was not present. Her counsel represented that the mother had received her monthly Social Security disability payment that same day and did not have enough time to arrange transportation to Massachusetts. Counsel renewed the motion for the mother to be permitted to participate at trial by video conference, and the judge replied that the mother "chose to go to West Virginia, knowing we had this case scheduled for trial." The judge ruled, "The court is not going to allow virtual participation for a parent. Just the assessment of credibility, I have found, is

6

very difficult to do by [video conference].  And it is so important in a termination case that I am just not comfortable doing that."  At the request of the mother's counsel, the judge continued the trial until March 30, choosing that date because the mother's counsel said that it would be just after the mother received her next benefit payment.

Immediately after that hearing, the social worker texted the mother and impressed on her the importance of appearing at the March 30 trial and trying to reunify with Octavia.

At the beginning of trial, the mother's counsel informed the judge that he had received an e-mail that morning from the mother stating that she would not be able to attend trial because she did not have the financial ability to do so.  The mother did not renew her motion to be permitted to testify by video conferencing.

As of trial, the mother was not in compliance with her DCF action plan.  She had often been late for visits with Octavia, had not made herself available for visits with Octavia at any time after January 25, 2023,[4] and missed more than fourteen of nineteen scheduled meetings with the social worker.  The mother did not obtain a comprehensive psychological assessment or

---

[4] The social worker testified that the mother did not ask for video-conference visits with Octavia from West Virginia.

parenting assessment, access substance abuse treatment, participate in therapy enough to derive any benefit, attend parenting groups, or avail herself of domestic violence services.[5] The mother did not appear at trial, and the judge drew an adverse inference from her failure to do so. The judge concluded that the mother was unfit to parent Octavia and it was in Octavia's best interests that the mother's parental rights be terminated.

Discussion. 1. Denial of the mother's motion to participate at trial by video conference. The mother argues that the judge should have excused her from attending the trial and instead permitted her to participate by video conference. We are not persuaded.

A standing order of the Juvenile Court provides that a hearing on termination of parental rights "shall be held in person," except that it "may be held virtually in a specific case in the discretion of the presiding judge." Juvenile Court Standing Order 1-22(III)(A)(2) (2022). We review the judge's ruling for an abuse of discretion, which occurs when a decision "amounts to a 'clear error of judgment' that falls 'outside the range of reasonable alternatives.'" Adoption of Xarissa, 99

_____

[5] The mother signed no releases for verification of any services in West Virginia, and the judge found that she received no significant services there.

8

Mass. App. Ct. 610, 616 (2021), quoting Adoption of Talik, 92 Mass. App. Ct. 367, 375 (2017).

Putting aside the fact that the mother did not raise during trial her request to participate by video conference, we discern no abuse of discretion in the judge's pretrial ruling. "Evaluating a witness's credibility is one of the most difficult tasks facing a trier of fact . . . [and] [p]ersonal observation of a witness aids immeasurably this process." Adoption of Parker, 77 Mass. App. Ct. 619, 623 (2010), quoting Commonwealth v. Bergstrom, 402 Mass. 534, 548 (1988). The judge properly exercised her discretion when she ruled that the mother's in-person attendance at trial would aid the judge in performing the difficult task of assessing the mother's credibility.

The mother contends that the judge's denial of the mother's motion to testify at trial by video conferencing was based on the judge's "personal idiosyncrasy." On the contrary, the judge's exercise of her discretion was in accordance with the Juvenile Court standing order. At oral argument, the mother further argued that the judge's statement that she would not "allow virtual participation for a parent" implied that the judge was treating the mother differently from other witnesses because she was a "parent." We discern no such bias in the judge's exercise of her discretion, especially because the two

9

witnesses, DCF social workers, who did testify at trial appeared in person.

For the first time on appeal, the mother argues that the judge's ruling requiring the mother to appear in person at trial violated her constitutional rights to due process and equal protection because she is "indigent."  Because those constitutional arguments were not raised at trial, they are waived.  See Adoption of Ursa, 103 Mass. App. Ct. 558, 570 (2023).  Beyond that, on the record before us, we could not determine the mother's indigency.  In her motion in limine and through her counsel on the morning of trial, the mother asserted that she did not have the money to travel to Massachusetts.  In contrast, as the mother's counsel represented to the judge on the original trial date and the social worker testified at trial, the mother repeatedly asserted that she would have the money once she received her benefit payments.  None of those assertions by the mother were supported by affidavit, and the mother never filed a motion under the indigent court costs law, G. L. c. 261, § 27C (4), for funds for travel expenses.[6]  If a parent is indigent, that might well entitle the parent to funds for travel expenses, but it would not undermine the judge's

---

[6] Such a motion would have had to have been supported by an affidavit of indigency, G. L. c. 261, § 27B.

10

discretion under the Juvenile Court standing order to require an in-person trial.  Cf. Adoption of Edmund, 50 Mass. App. Ct. 526, 529-530 (2000) (denial of incarcerated father's repeated requests to participate at trial by telephone conferencing violated due process, where "no other procedure to respond was afforded to him").

Moreover, the mother has not shown prejudice, because she has not pointed to any specific evidence of her unfitness or Octavia's best interests that she could have rebutted had she participated in the trial by video conference.  Cf. Adoption of Edmund, 50 Mass. App. Ct. at 531 (remanding to permit incarcerated father precluded from participating at trial by telephone to submit affidavit responding to DCF's evidence). Indeed, the mother does not contest any of the judge's findings that the mother is unfit and that Octavia's best interests will be served by terminating the mother's parental rights.  We note that the judge's "'specific and detailed' findings," which the mother does not challenge as erroneous, "demonstrate [the mother's] parental unfitness clearly and convincingly." Adoption of Jacob, 99 Mass. App. Ct. 258, 262 (2021), quoting Custody of Eleanor, 414 Mass. 795, 799 (1993).

2.  Adverse inference.  The judge drew an adverse inference from the mother's failure to appear at trial, stating:

11

"The adverse inference I draw is that if [m]other were here and forced to testify under oath, she would testify that she at this time lacks stable housing, is not engaged in any services -- for example, therapy, parent nurturing classes, psychiatry -- that she is no longer on prescribed medication, and that she is not currently fit and able to care for [Octavia]" (emphasis added).

We review the judge's decision to draw such an adverse inference for an abuse of discretion. See Adoption of Helga, 97 Mass. App. Ct. 521, 526-527 (2020).

We discern no abuse of the judge's discretion. In the context of the evidence that the mother had moved to West Virginia just before trial without making efforts to visit Octavia, the judge could reasonably conclude that the mother's failure to appear for trial "was evidence that she was not making efforts to be reunited with [Octavia]." Adoption of Helga, 97 Mass. App. Ct. at 526. See Adoption of Talik, 92 Mass. App. Ct. at 370-373. It was within the judge's discretion to conclude that the mother's assertion that she could not afford to attend trial was not "an adequate explanation." Adoption of Helga, supra. Contrast Adoption of Patty, 489 Mass. 630, 645 (2022) (judge abused discretion in drawing adverse inference against parent for not participating in video-conference trial, where parent's absence was attributable to inadequate explanation of video technology).

12

The mother argues that when, in drawing the adverse inference, the judge found that the mother would have testified "that she is not currently fit and able to care for [Octavia]," the judge abused her discretion because that testimony would have essentially amounted to a "stipulat[ion]" to termination of the mother's parental rights. We read the judge's finding to mean that, had the mother testified, she would have admitted to her many failures as a parent to Octavia which led to the conclusion that she was unfit, not that she would have necessarily uttered the words "not currently fit." Beyond that, as Octavia points out, the inference was essentially cumulative of the trial evidence that the mother had said that she planned to stipulate to termination of her parental rights as to Octavia, as she had as to Astrid, and that she "c[ould]n't

13

really do much" for either child.

    <u>Conclusion</u>.  Accordingly, the decree terminating the mother's parental rights to Octavia is affirmed.

<u>So ordered</u>.

By the Court (Desmond, Hand &
  Grant, JJ.[7]),

Assistant Clerk

Entered:  May 17, 2024.

---

[7] The panelists are listed in order of seniority.